Mrs. Anna Wilkerson, Administratrix of Estate of Luther Wilkerson, Deceased, Appellee, v. Walter J. Cummings, Receiver, et al., Trading as Chicago Surface Lines, Appellants.

## Gen. No. 42,845.

332

Opinion filed December 13, 1944. Released for publication January 4, 1945.

FRANK L. KRIETE, CHARLES E. GREEN and ARTHUR J. DONOVAN, all of Chicago, for appellants; WILLIAM J. FLAHERTY, of Chicago, of counsel.

EUGENE S. COLBURN and REUBEN S. FLACKS, of Chicago, for appellee.

Mr. Presiding Justice Burke delivered the opinion of the court.

Anna Wilkerson, as administratrix of the estate of Luther Wilkerson, deceased, filed a complaint in the circuit court of Cook county against the receivers of the corporations doing business as the Chicago Surface Lines. Her action was brought under the Injuries Act to recover pecuniary loss sustained by reason of the death of her husband, Luther Wilkerson, caused by a collision of an automobile he was driving with the rear end of a standing street car on Kedzie avenue at 48th place in Chicago on Thursday night, May 8, 1941. The case was tried before the court and a jury, resulting in a verdict for the plaintiff for $5,000. Motions for judgment notwithstanding the verdict, and in the alternative, for a new trial, were denied and judgment was entered on the verdict. Defendants appeal.

Kedzie avenue is a north and south street, on which is laid a double track street car line. The street is 45 to 47 feet wide from curb to curb. It is 14 feet 5 inches or 15 feet from the curb to the first rail of the street car track. A railroad viaduct crosses over Kedzie avenue at 49th street at right angles, 15 or 16 feet above the street. There is a dip of 4 or 5 feet in the level of the street where it goes under the viaduct, with a gradual incline on both sides extending about a block each way. The grade is about one foot for every 50 feet in length and is approximately 250 feet long. The street is perfectly straight north and south of and under the viaduct and so is the curb, which is well defined. The north upgrade begins 50 feet north of the viaduct. The viaduct is supported in the center by pillars, or abutments, which are about 3 feet wide because of which both street car tracks curve outward for about 2 feet. From 20 feet north of the viaduct, according to a witness, and 50 feet north of the viaduct according to another witness, the northbound street car track curves back to its regular position and is

straight from that point north. The street is well paved with brick between the street car tracks and curb and with granite blocks on the street car right of way. The pavement was dry. The sky was overcast and the moon was obscured by clouds. The street underneath the viaduct is well lighted by overhead lights attached to the viaduct, the direct rays of which strike the street from 5 feet beyond the edge of the viaduct according to the testimony of one witness, 15 feet according to the testimony of another, and 40 feet according to the testimony of a third witness. There is a city arc light on a pole 20 feet or more high, located on the east side of the street just inside the curb and from 75 to 80 feet north of the viaduct, and a similar city arc light on a pole on the east side of the street 275 feet north of the viaduct. There are no lights on the west side of the street. The arc lights have around 1,000 watt bulbs, with flat reflectors above them and the direct rays are cast on the street for from 10 to 30 feet from the base of the pole. These two lights were lighted and there were other lights burning all along the street. While the direct rays of the arc lights were reflected downward, some of the light was diffused outward. Defendants were operating their street car northbound on Kedzie avenue. After the car passed beneath the viaduct, the trolley rope broke and, the trolley became detached from the trolley wire. Because of this the power was shut off, all the lights on the street car went out and the street car came to a stop with its rear end about 117 to 120 feet north of the viaduct, according to the policemen, or 65 feet from the viaduct, according to the motorman. The conductor said it stopped with its rear end 50 feet south of 48th place. At the time the street car came to a stop it was approximately 11:30 p. m. When the street car stopped, the conductor got off. After a few seconds the motorman put his head out of the front door and the conductor told him that the trolley

rope was broken. The motorman got off, went to the rear of the street car, told the conductor he would go on the roof of the street car and that the conductor should throw the rope up to him. The motorman proceeded to climb up to the roof of the street car on some lugs attached to the west side of the street car near the rear. The motorman put the trolley pole under the hook and asked the conductor to throw the rope up to him, which was done. The motorman fastened the rope to the trolley pole and then started to come down off the roof. While he was doing so, the automobile being driven by plaintiff's intestate grazed the conductor's leg, tearing his trousers, and crashed into the rear of the street car with sufficient force to severely damage the automobile and to kill its driver. The motor of the automobile was "racing" and the conductor shut it off. The automobile hit the rear of the street car in the center, or to the right of the center. After the accident the automobile was standing on an angle with its right front wheel east of the east rail of the northbound track. The left front wheel was west of the east rail at about the center of the northbound tracks and its rear wheels were in the northbound tracks. At the time of the impact the lights of the automobile were lighted. The front right half of the automobile was not damaged. There is a dispute in the evidence as to whether the automobile was wedged under the street car, or was standing with the front end a foot or so from the rear of the street car. The street car stood on the street unlighted from 3 to 6 minutes before the automobile crashed into it. One witness who sat in the street car until the crash occurred and then immediately went out, said that when the car went dark, the passengers were sitting in the car approximately 5 minutes more or less, and later that altogether the car was standing between 8 and 10 minutes. To make the repair required with reasonable dispatch, requires 5 or 6 minutes. The

street car could have been lighted by putting the front trolley pole on the trolley wire. It would have taken 45 seconds to a minute to have gone to the front end of the car to put the front trolley pole on the trolley wire. This was not done. If it had been done it would have charged the rear trolley pole, on which the motorman was working, with 600 volts of electricity. There is no evidence of the rate of speed at which the automobile was being driven, except that as a result of its collision with the street car, the automobile was severely damaged and its driver killed. There is no evidence as to what the driver of the automobile was doing just prior to the collision; as to where he was looking; as to whether he was paying attention to the street ahead of the automobile or that he was driving the automobile with due care. His eyesight was good and he was well acquainted with Kedzie avenue at 48th place. He drove that way many times to and from work. He had a Plymouth automobile with four wheel hydraulic brakes. It also had an emergency brake. There were headlights on the automobile and the one which was not broken in the collision was still burning after the collision. The street car was 13 feet high, 8 feet wide and about 50 feet long, weighed 27 tons and was painted red. The rear end of the street car was standing about 117 to 120 feet from the viaduct, which would place it between 40 and 50 feet from the city arc light which was standing about 20 feet high and 75 to 80 feet from the viaduct.

Police Officer Norman Ade drove to the scene of the occurrence in a police car a few minutes after the accident. The police car turned onto Kedzie avenue at 47th street. Testifying for plaintiff he said that when their car turned to go south, he could see the whole street ahead of him; that the night was clear and the streets dry; that their automobile headlights showed the street ahead of them a couple of hundred feet, and that they could observe "any object in the street that

we might bump into.'' Police Officer Spencer Samuel, called by plaintiff, testified that the weather was clear; that while seated next to Officer Ade in the police car traveling in a southerly direction on Kedzie avenue, between 47th street and 48th place he could see as far as the viaduct, and that he had no trouble in seeing a full block. Lawrence Peters, the conductor, who at the time he testified was not in the employ of the defendants, called to the stand by plaintiffs, said: ''It was a clear night. When I stepped off the platform, the platform was dark. I could see the step of the car. I looked as I stepped down. I could see that right in the light of that street light. I could see all parts of my street car. That street car was painted red, and it looked red to me. When I went around in back, I saw that the rope at the back end of the car was disconnected from the trolley pole. From the rear platform of the street car where I was standing out there, at the time I talked to the motorman, in looking south, I could see through the viaduct. The street and viaduct were perfectly straight, and all the street lights were lighted. When the motorman went up on the top of that car, he had to first find the trolley pole, which is a black metal, not shiny at all. He found that readily and he used no light except the street lights.'' The conductor testified further that from where he was standing back of the street car, he could see a man standing on the east curb who had been riding on the rear platform. He saw the tan jacket the man was wearing. When he went over to the automobile he had no trouble seeing that the left door was open. He had no trouble seeing all parts of the automobile. He testified that the visibility was good and that he could see three blocks ahead and that he had no trouble seeing the rope after he got out of the car. The rope was one third of an inch thick.

Jan Grochala, a passenger on the street car, seated at about the middle of the car until the crash and who

testified for plaintiff, was able to see the motorman open the door at the front; to see people get off and walk toward 47th street; to see the passengers get up and walk off the car; to see between 8 and 11 people walk off the front platform and some walk off the rear, both men and women; to see some of them on the street while he was sitting in the car; to see the motorman get off; to see his uniform; to see the motorman walk along the other side of the car from which the witness was sitting; to distinguish his hat or cap; to see some people standing on the curb, both men and women, when he went to the rear platform preparatory to getting off, and to see people on the sidewalk. Police Officer Michael Delaney approached the scene of the occurrence from the south in an automobile "a little after midnight." His "partner" was driving. The street car and automobile involved had been moved. He testified: "Before we passed through the viaduct, just as we are approaching within 50, 60 or 100 feet before we get to the viaduct, and as we are about to go in and through it on that track and as we look ahead, beyond the viaduct, I would say that I could see that portion of the street car track which is beyond and to the left after the curve starts north of the viaduct. I could see both sides of the street as I am driving along myself. I think I might be trained a little bit better in that, probably than some." He also testified that the "lighting" conditions at the scene of the collision were good. The motorman, John McCarthy, testified that when he walked back the condition of the lights right along the car was very good; that he could see the street in front of him; that when he went around on the west side of the car to get up on top, he could see where he was stepping; that he used no other artificial light or flashlight in looking to see where he was going in mounting the top of the car; that when he got on top of the car he saw the black metal pole very clearly which was straight up in the

air and off to the right; that when the conductor threw the rope up to him he caught it on the first throw; that while he was walking on the roof of the car he had no other light than the artificial light afforded right at the location; that the visibility when he stepped out of the car was very good; that it was a clear night; that he could see south on Kedzie avenue to about 52nd street; and that he could discern objects about 5 blocks north of 48th place. One witness, referring to the collision, testified that it was not a violent blow; that it was very light and that he could barely hear it. Another witness testified that it was a violent smash and another that it was a terrific crash. A police officer testified that the automobile was damaged from the left front side to a little past the center of it and that the right front fender was not damaged; that the left front headlight was damaged and out; that the whole front of the center, the front of the radiator, the grill and the left front fender were damaged. Another police officer said that the left front half of the automobile was damaged and that both the street car and automobile were damaged. The conductor testified that the automobile hit the street car so hard as to separate the metal on the bumper; that it depressed the metal probably 3 or 4 inches and that it was a heavy piece of steel. A police officer found debris or parts of the automobile, the bumper and so forth, lying on the pavement at the point of the impact; that there were marks on the right rear of the street car and that mostly the left front of the automobile was damaged. The motorman testified that he had locked the wheels of the street car by setting the air brakes with 90 pounds of pressure and that the smash at the rear end of the car moved the car about a foot and a half or two feet.

Defendants insist that the evidence is not sufficient to show, either as a matter of law or as a matter of fact, that plaintiff's intestate was in the exercise of due care for his own safety at and just before the collision.

They assert that if "plaintiff's intestate failed to exercise such care for his own safety as an ordinarily prudent person would have exercised in the same circumstances, and if such failure contributed in any degree to bring about his death, plaintiff is barred from recovery." We do not agree with that statement. In *Schmidt v. Anderson*, 301 Ill. App. 28, we considered an instruction, a portion of which required that the jury, before finding for the plaintiff, determine that he was not guilty of "any negligence which in any degree contributed to cause said accident." We reviewed the authorities on the subject and held that this instruction was erroneous. We said: (50) : "Contributory negligence is such an act or omission on the part of a plaintiff amounting to a want of ordinary care, as concurring or cooperating with the negligent act of the defendant, is a proximate cause of the injury complained of." Plaintiff maintains that the evidence was sufficient to show, both as a matter of law and as a matter of fact, that plaintiff's intestate was in the exercise of due care for his own safety at and immediately before the collision. In order to recover it must be alleged and proved that deceased was in the exercise of due care for his personal safety. The record is silent as to what plaintiff's intestate was doing, or where he was looking while his automobile traveled 117 feet from the viaduct to the point of collision. Nor is there a word of evidence that he was keeping a reasonably careful lookout ahead of his automobile such as a reasonably prudent person would do in the circumstances there present. There is no evidence that the deceased was driving his automobile at a speed which was consistent with due care and the circumstances there present. The street car was standing still so that all the force of the collision was produced by the automobile. This has no tendency to prove that the automobile was being driven at a speed consistent with due care. Plaintiffs say that due care

need not be proved by direct and positive testimony, but such due care may be inferred from all the circumstances shown to exist immediately prior to and at the time of the collision. That is true as the statement of an abstract proposition. However, the circumstances shown by the record in this case do not establish that due care was exercised by plaintiff's intestate. By a motion for a judgment notwithstanding the verdict, the sole question presented to the court is whether, admitting the evidence in favor of the plaintiff to be true, that evidence, together with all legitimate inferences, fairly tends to sustain plaintiff's cause of action. In deciding such a motion the court has no right to pass upon the credibility of the witnesses, to consider any purported impeachment, or the weight of the testimony, since the motion admits the evidence in favor of the plaintiff to be true, together with all legitimate inferences. We have adhered to this rule in passing on the point urged. "The purpose of looking, as an act of caution, is to determine what one shall safely do next; ordinarily this will be to move or to stand still; hence the looking must be done when and where one can act safely with reference to any danger observed, otherwise the act of looking is minus the element of caution. If plaintiff looked only the instant she was struck, she failed to look with the care and caution necessary for her safety, so that she must be considered as having moved towards the tracks and within the danger zone without looking." *Myhre v. Chicago City Ry. Co.*, 216 Ill. App. 128. In *Dee v. City of Peru*, 343 Ill. 36, our Supreme Court said (42): "The law will not tolerate the absurdity of permitting one to testify that he looked and did not see the danger when the view was unobstructed, and where, if he had properly exercised his sight, he would have seen it." In *Chicago, R. I. & P. R. Co. v. Clark*, 108 Ill. 113, appellant insisted that the trial court erred in admitting

evidence as to the habits of deceased as to care, prudence and sobriety. The court said (117): " . . . as no person was present, or knew how the accident occurred, we think this evidence tended to prove that averment. If he was habitually prudent, cautious and temperate, it tended to prove he was so at the time of the injury, which, with the instinct of self-preservation, would be evidence for the consideration of the jury in determining whether he was in the exercise of care. Had there been witnesses who saw the infliction of the injury, the jury could then have determined from such evidence whether he was careful or negligent, and in such a case this evidence would not be admissible." In *Illinois Cent. R. Co. v. Ashline,* 171 Ill. 313, the court said (317): "It is also claimed that the court erred in the admission of evidence that the deceased was a man of careful habits. It was held in *Chicago, Rock Island and Pacific Railway Co. v. Clark,* 108 Ill. 113, that such evidence was not admissible except in cases where no witness saw the accident. The evidence leaves the question in doubt whether any person saw the deceased when he was struck by the train, and when such is the case we are inclined to think the evidence admissible." In *Collison v. Illinois Cent. R. Co.,* 239 Ill. 532, the court said (537):

"The second [instruction] informed the jury that they had the right to take into consideration, with the other facts and circumstances proven in the case, the instinct which naturally leads men to avoid injury and preserve their own lives, in determining whether or not the deceased was using due care for his own safety. The instruction made no reference to the evidence concerning the character and habits of the deceased in respect to care, but stated the broad proposition as applying to all men. It is true that there is an instinct of self-preservation common to all and that such instinct raises a presumption against an af-

firmative act tending to destroy life, such as suicide, and raises a presumption as to the conduct of a person where there is a known danger to be avoided. The presumption is based upon human experience that a man will, in the presence of danger, act in accordance with the instinct of self-preservation, but that instinct is only operative when danger is perceived. The law recognizes that there are persons who are careless, heedless and inattentive as well as those who are prudent and careful, and that the instinct of self-preservation does not uniformly lead men to exercise care to ascertain whether conditions exist which are likely to inflict injury. To establish and apply a general presumption in favor of care would obviate the necessity of making proof of the fact, which this court has uniformly held must be made. Where there is no eyewitness to the killing of a person, his administrator may establish the exercise of ordinary care on the part of the deceased by the highest proof of which the case is capable. (*Missouri Furnace Co. v. Abend,* 107 Ill. 44; *Chicago and Atlantic Railway Co. v. Carey,* 115 id. 115; *Illinois Central Railroad Co. v. Nowicki,* 148 id. 29.) In the latter case it was said that where no one saw the killing, direct testimony as to care is not necessary but it may be inferred from the circumstances of the case. Reference was made to decisions of the courts of two other States relating to the instinct of self-preservation, but their views were not endorsed except in connection with evidence as to the character and habits of the deceased, which might make the presumption applicable to the particular individual."

In *Petro v. Hines,* 299 Ill. 236, the court said (239): "But where there is an eye-witness who saw the infliction of the injury, the jury must then determine from the testimony of this witness and from the facts and circumstances surrounding the injury whether deceased was careful or negligent, and in such case evi-

dence of the habits of deceased as to care and prudence is not admissible. (*Chicago Rock Island and Pacific Railway Co. v. Clark,* 108 Ill. 113.) There was at least one eye-witness to this accident, and the court erred in refusing to exclude this evidence."

Applying these rules to the proof in the case at bar, it is manifest that plaintiff cannot rely upon the instinct of self-preservation, common to all men, to establish the exercise of due care and caution on the part of the deceased. There were eye-witnesses to this occurrence. Plaintiff recognized this and did not offer testimony of the habits of deceased as to sobriety, prudence and the exercise of care and caution in the ordinary affairs of life. One of the purposes of automobile headlights is to illuminate the space a reasonable distance in front of the automobile so that the driver can see pedestrians, vehicles and other objects in the roadway, allowing him to drive in accordance with the care required for the conditions thus revealed. There is no evidence that deceased used any care at all to discover the danger in time to avoid it. If he, through carelessness, was not aware of the danger until it was too late to avoid it, then any effort thereafter made to avoid the collision would not avail as an excuse for such carelessness in getting into danger. The instinct of self-preservation does not become operative until the danger is perceived, and consequently cannot have any effect upon want of care before the danger is perceived. *Collison v. Illinois Cent. R. Co.,* 239 Ill. 532. It is the province of the jury to determine from the evidence whether or not the person injured or killed was in the exercise of due care. There must be evidence from which the jury may determine this essential element. The jury cannot function without evidence. A jury will not be permitted to base a finding of fact upon conjecture or surmise. Because of the failure of plaintiff to produce any evidence of due care on the part of plaintiff's intestate, the judgment

of the circuit court of Cook county is reversed and the cause remanded with directions to enter a judgment notwithstanding the verdict for the defendants and against plaintiff. It is unnecessary to comment on the other points argued.

*Judgment reversed and cause remanded with directions.*

KILEY and LUPE, JJ., concur.