John F. Elliott, Administrator of Estate of Freeman P. Elliott, Deceased, and Raymond Mattox, Administrator of Estate of James R. Mattox, Deceased, Appellees, v. Elgin, Joliet & Eastern Railway Company, Appellant.

Gen. No. 43,026.

162

Heard in the third division of this court for the first district at the April term, 1944. Opinion filed February 14, 1945. Rehearing denied March 5, 1945. Released for publication March 5, 1945.

KNAPP, CUSHING, HERSHBERGER & STEVENSON, of Chicago, for appellant; HARLAN L. HACKBERT, of Chicago, of counsel.

KROHN & MACDONALD and NOBLE STIBOLT, all of Chicago, for appellees; STUART B. KROHN and IAN P. MACDONALD, both of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Separate complaints were filed in the circuit court of Cook county by John F. Elliott, administrator of the estate of Freeman P. Elliott, deceased, and by Raymond Mattox, administrator of the estate of James R.

Mattox, deceased, against the Elgin, Joliet and Eastern Railway Company, for damages under the Injuries Act because of the death of two boys, 16 and 17 years old, by the alleged wrongful neglect of defendant. The actions were consolidated for trial and for all further proceedings. A trial before the court and a jury resulted in verdicts in favor of each plaintiff for $10,000. Motions for judgments notwithstanding the verdicts and for a new trial, were denied, and judgments were entered on the verdicts, to reverse which defendant appeals.

The accident occurred on Friday, July 31, 1942, at about 8:15 p. m. at the intersection of defendant's tracks and Main street in Matteson, Illinois, about 200 feet east of a viaduct by means of which defendant's tracks passed under the elevated tracks of the Illinois Central Railroad Company. Defendant's two main line tracks, the eastbound main and the westbound main, cross Main street (which runs north and south) approximately at right angles. To the south of the main line tracks, two tracks for delivery to the Illinois Central, cross the highway on a curve. Defendant's combined office building and depot is north of the tracks and west of the highway. Defendant's train was eastbound, operating over the more southerly of the two main line tracks. A traveler approaching the crossing from the north passes under the Illinois Central tracks in a southeasterly direction, then there is a curve in the road, after which the road runs straight north and south about 400 feet to the railroad crossing. A survey received in evidence and the testimony of Charles Boese, the surveyor who measured and computed the distances, established that from a point on the highway 87 feet north of the center line of the eastbound main, a traveler has an unobstructed view down the eastbound track to the edge of the viaduct, which is 197 feet from the center line of the highway. There are two two-way duplex automatic flasher

signals at the crossing, the one on the north being west of the roadway, 24 feet north of the center line of the eastbound main, and the one to the south being on the east side of the highway and south of the delivery tracks to the Illinois Central. Each signal standard has two lights so arranged that they show both to the north and to the south on each standard. Above the lights on each signal standard there is the usual cross-arm with the words "railroad crossing" marked in large letters. At the crossing there is also an automatic bell warning signal. There are no gates at this crossing and no watchman is stationed there. The flasher and bell ringing signals are electrified so that when a train comes in contact with a certain spot on the rails it starts the signals, and as soon as the train clears the crossing and reaches a certain point on the other side, not electrified, the flasher and bell stop operating. The points at which the flasher and bell commence and cease operating may be fixed at any distance from the railroad crossing desired by the railroad. If a train occupies any space between these points, the flasher and bell, if working, will keep on flashing and ringing. Although there was no positive evidence to show where the flasher contact point was located west of the crossing, there was evidence which shows that the two delivery tracks for the Illinois Central Railroad were in the circuit, and that on that evening there were cars on the delivery track located 300 feet east of a shanty, which was 100 feet east of the crossing, and that these cars were not within the circuit for the flasher signs, which would locate the circuit somewhere between 300 and 400 feet east of the crossing on the east side and presumably the same distance on the west side of the crossing.

It was daylight and the weather was good at the time of the unfortunate occurrence. The Elliott and Mattox boys were passengers in an automobile owned and driven by Donald Luebchow. The three boys were

high school students, 16 or 17 years of age, and were on their way to a farmer's sale at Crete, about six miles south, each intending to buy livestock or poultry to raise and thus earn some money during the summer vacation. The automobile was traveling south on Main street and it was struck in about the center of the highway by an eastbound freight train traveling on the more southerly of the main line tracks. The Elliott boy was killed almost instantly and the Mattox boy died later that night from his injuries. The Luebchow boy, the driver of the car, was injured. At the time of the trial he was in the Army. They were active, strong boys, in good health and hard working. One of the boys was earning $25 to $30 a week and the other boy worked on a farm during the summer vacation.

Lionel Ray Stoll, a schoolmate of the boys, testified that he was traveling on his bicycle south on Main street after the accident when his attention was attracted to the standing train and to the boys' bodies about 28 yards east of Main street. He testified that the train was standing, blocking the crossing, and that the flashers were not working at that time. On cross-examination he testified that it was still daylight; that as he came down Main street he noticed that the train was standing there; that when he saw the train he glanced at the flasher signal; and that he was at the crossing before he noticed the bodies or the wreckage or that anything unusual had happened.

Mike Picchi testified that he was at the Mattox home when news of the accident reached there, and that he drove Mrs. Mattox to the scene in his automobile. Upon direct examination he testified that he was too excited to notice whether the train was standing on the crossing; that he was just watching for the Mattox boy, whose body was in an ambulance when he got there; that he did notice the flasher; that "the flasher was not on when we got out there, because the train wasn't standing there"; and that "when we got

over there, the flasher wasn't going on." On cross-examination he stated that the light was not on when he got there, but he didn't pay much attention.

James Fox testified that he had been employed approximately 10 years by railroads as a fireman, engineer or switchman and that he was familiar with the automatic flasher signal used by defendant at the Main street crossing; that the flasher signal is electrified so that when a train comes in contact with a certain spot on the rails it starts the signal, and that the signal continues to operate until the train clears a point on the other side of the crossing. On cross-examination he admitted that his familiarity with the signal at the crossing was based solely on the fact that he had worked six or seven months in 1925 installing signals for the Chicago & E. I. R. R.; that he had driven over the crossing about 15 times in the past seven years visiting relatives, and that on one occasion after the occurrence "at the request of some folks over there" he laid a bar across the rails. He admitted he was not able to tell from his knowledge of this crossing just where a train must be standing in order to set the flasher signal in motion. Over objection, the fathers of the two boys testified that their sons were of "ordinarily careful habits" in traveling upon streets and highways. Mr. Mattox also testified that the Luebchow boy went into the Army in March 1943; that he had talked to the boy's father about three weeks before the trial and was informed that he was stationed in Nebraska about five weeks before that, and that he didn't know where he was to be sent from Nebraska. Defendant's objection that the testimony as to careful habits was inadmissible because there was an eyewitness to the accident, the Luebchow boy, and that there had been no showing of any diligent attempt to obtain his presence at the trial, or his deposition, was overruled.

Walter L. Elwood, the engineer, testified that the train was traveling about 25 miles an hour; that he

sounded the whistle from the whistling post, a quarter of a mile west of the crossing, and continued to sound the whistle to the crossing; that the engine bell was ringing from the time he left Frankfort, Illinois, about six miles west of Matteson, continuously until past the place of the occurrence. As engineer, he was seated on the right hand side of the locomotive, or the side away from the approaching automobile, and his first knowledge that there was going to be an ''accident'' was when the fireman jumped off the seat box. He made a service application of the brakes and brought the engine to a stop about 50 car lengths east of the crossing. The train consisted of 58 cars, all equipped with air, and when the crash came the air was applied to act with equal pressure on all the cars, and the front end of the locomotive came to a stop about 50 car lengths east of the crossing, or a distance of between 2,500 and 2,700 feet. Upon redirect examination he testified that the reason for making a service application of the brakes rather than an emergency application was that the ''accident'' had already occurred, his train contained 26 cars of explosives and he didn't want to take a chance on doing more damage. After the train came to a stop he remained with the locomotive about 25 minutes, and when the fireman returned, he went back to the crossing and also into the depot. The flasher signals at the north side of the crossing were operating when he went back to the crossing, but he didn't remember whether the crossing bell was ringing.

Wendell Bishop, the fireman, testified that the engine whistle was blown continuously from a point about a quarter of a mile away from the crossing until the point of the mishap, and that the engine bell was ringing from the time the train left Frankfort. As they approached the crossing the train was traveling from 25 to 30 miles an hour. He was riding on the left or north side of the locomotive, the side from which the automobile approached. He saw the automobile when

it was about 100 feet north of the crossing and when the front end of the locomotive was about 100 feet from the crossing. The automobile was traveling at about 35 miles an hour. Its speed did not decrease at all until the time of the collision. He saw one boy in the back seat of the automobile moving around, but did not notice what the boys in the front seat were doing. He did not notice any of the boys in the automobile looking west toward the approaching train. After the mishap he went back to where the boys were lying, but did not go back to the crossing itself. On cross-examination he testified that his estimates of the relative distances of the automobile and train from the crossing and their respective speeds were approximate, according to his best judgment.

Wilbur L. Cazel, the station agent, testified that from his position at the telegraph table in an alcove projecting from the south wall of the depot building, he saw the train approaching from the west. Prior to the time of the collision he heard the crossing bell ringing and he heard the engine whistle "very distinctly." The whistle was blowing at the time the engine passed in front of the station. After the event he went out to the crossing and noticed that the flasher was working and the bell ringing. That was within five minutes after the impact and prior to the time that the ambulance arrived.

Merritt E. Cagwin, the head brakeman, testified that he was riding on the tender of the engine in the cabin for the head brakeman. His first knowledge of the mishap was when something flew up and hit the first car back of the engine. After the train came to a stop he went back to the crossing and observed that the flasher signals on the north side of the track were working. He did not remember whether the crossing bell was ringing at that time or not.

O. A. Taylor, the conductor of the train, testified that he was riding on the engineer's side, or the south side of the caboose at the rear of the train, with his

head out the window; that his first knowledge that there had been an "accident" was after the train stopped; that the caboose was then about eight car lengths west of the crossing; that he got out on the north side of the caboose and went to where the boys' bodies and the wreckage of the automobile were; that as he passed over the highway crossing he noticed that the flasher signals were working and the bell ringing. He testified further that when the caboose was about 10 or 15 car lengths west of the crossing before the train had come to a stop, as he was leaning out of the window, he noticed that the flasher signals at the south side of the crossing were operating, as he could see the light flashing through a peep hole in the side of the flasher light containers; and that the flasher lights continued to work until he had the train uncoupled. On cross-examination he testified that the flasher signal operates by electrical contact and that so long as there is anything on the rails between the two contact points the flasher will work.

Rueben Robertson, defendant's car inspector at Matteson, testified that he came to work at 8 p. m. on the night of the occurrence; that he left the depot about 8:12 or 8:15 p. m. to walk down to his shanty, which was about 100 feet east of the crossing; that when he was about 50 feet east of the crossing he heard the train whistle, stopped and looked back; that when he looked back he saw the automobile coming from the north, about 300 or 400 feet from the railroad crossing; that he heard the engine whistle, saw the flashers going and heard the crossing bell ringing; that the crossing bell rang until after the collision; that the flasher signals worked continuously until the time of the impact; that the automobile did not swerve to the right or left; and that it was struck in the center of the highway, and in the center of the eastbound main tracks. On cross-examination, he testified that he

heard the whistle when the train was between an eighth and a quarter of a mile west of the crossing; that he did not know how far the flasher circuit went west of the crossing, and that he noticed the flashers working on the south side of the crossing after he heard the blast of the whistle. He testified that there were cars for him to inspect east of the crossing on the No. 1 receiving track. On redirect examination, he testified that these cars were down in the yard and not within the circuit for the flasher signal. Defendant's motion at the close of all the evidence to strike the testimony of Elliott and Mattox with respect to the habits of due care of the boys on the ground that there were at least two eyewitnesses, the fireman and the car inspector, was denied.

The first criticism leveled at the judgment is that plaintiffs' decedents were guilty of contributory negligence as a matter of law. Plaintiffs insist that their sons were in the exercise of due care for their own safety. The parties are agreed that contributory negligence is a question for the jury, except when the evidence of its existence is so clear that no reasonable minds could come to a contrary conclusion. In passing on defendant's point we have in mind the oft repeated rule that when there is any evidence which, taken with its reasonable inferences in its aspect most favorable to the plaintiffs, tends to show the use of due care, the question of due care is one for the jury. Whether there is any such evidence is a question of law. In determining the question, this court can examine the record only to determine whether there is any evidence tending to support the cause of action.

In *Dee v. City of Peru*, 343 Ill. 36, the court said (p. 42):

"It is the duty of a passenger in a vehicle, where he has an opportunity to learn of danger and to avoid it, to warn the driver of such vehicle of approaching

danger, and he has no right, because someone else is driving, to omit reasonable and prudent efforts on his own part to avoid danger.''

In *Opp v. Pryor*, 294 Ill. 538, the court said (p. 547):
"The plaintiff sat at the right of the driver in front, with at least equal opportunity to observe danger and the approach of the train, and being bound to prove the exercise of ordinary care by herself, it was no l s her duty than that of the driver to observe and avoid danger, if practicable, and to warn the driver.''

The rule has long been settled in this State and is generally recognized, that railroad crossings are dangerous places, and that one crossing must approach the track with the amount of care commensurate with the known danger, and when a traveler on a public highway fails to use ordinary precaution while driving over a railroad crossing, the general knowledge and experience of mankind condemns such conduct as negligence. *Moudy v. New York, C. & St. L. R. Co.*, 385 Ill. 446, 452. One who has an unobstructed view of an approaching train is not justified in closing his eyes and failing to look, or in crossing a railroad track upon the assumption that warning will be given. The law will not tolerate the absurdity of the contention that a person looked but did not see the train when the view was not obstructed, and where, if he had properly exercised his sight, he must have seen it. *Greenwald v. Baltimore & O. R. Co.*, 332 Ill. 627; *Carrell v. New York Cent. R. Co.*, 384 Ill. 599. The fact that the flasher signals were not operating would not excuse plaintiffs' decedents' failure to look and see the approaching train. In *Grubb v. Illinois Terminal Co.*, 366 Ill. 330, our Supreme Court said (p. 337):
"We believe the sound rule to be, that although the fact that a signal system is not operating is an indication to the traveler that it is safe to cross, nevertheless he is not thereby released of the duty of using reason-

able care for his own safety. Where the surroundings at a particular crossing give to the traveler an unobstructed view of a dangerous highway crossing he is not justified in failing to look, or, on looking, failing to see an approaching train, merely acting in reliance upon an assumption that no train is approaching. The law will not tolerate the absurdity of permitting one to testify that he looked and did not see, when, had he properly exercised his sight, he would have seen.''

We recognize that the negligence of Donald Luebchow, the driver of the car in which the boys were riding, cannot be imputed to them, if they were not in any way the cause of such negligence and omitted no ordinary care for their own safety. *Thompson v. Atchison, T. & S. F. Ry. Co.*, 258 Ill. App. 123. In passing on the proposition urged by defendant that the boys were guilty of contributory negligence as a matter of law, we are excluding from consideration defendant's contention that the boys were engaged in a joint enterprise.

Plaintiffs attack the credibility of defendant's witnesses Robertson and Bishop. As previously stated, in passing on defendant's point we are considering only the evidence favorable to plaintiffs and the reasonable inferences to be drawn therefrom. Plaintiffs urge that when taking into consideration that the accident occurred on July 31, 1942, when foliage and trees were in full bloom, with a depot and freight house only 50 feet from the track, and a train emerging from a tunnel only 197 feet from the crossing and with a supposed automatic flasher not giving a warning signal, it is clearly a condition which left the matter of contributory negligence a fact question to be decided by the jury. Plaintiffs also state that there was evidence of a train going west passing the eastbound train only one half mile before the latter train collided with the automobile, which further obscured the train

involved in the accident from the vision of the respective decedents, just prior to the collision. Plaintiffs ask us to bear in mind that we are dealing with passengers in an automobile; that there is no reliable evidence as to the speed of the automobile; that judging from the distance the train went after applying the brakes (one half mile) "together with the impossible story of defendant's fireman," would justify the jury in disbelieving that the train was only going 25 miles an hour, especially when it was one hour late. Plaintiffs argue that even if the occupants of the automobile could see the entrance to the viaduct at a point 87 feet north of the crossing, it is still mathematically possible that at that time the train had not yet emerged from the viaduct; that with the automobile moving forward all the time the passengers would then, not seeing any danger to the west, turn their attention, in the exercise of due care, to the east for any westbound train, because that would be the first track they would have to cross, naturally claiming their prior attention to it as the first point from which a train would come; that being lulled into security by the open invitation to cross in safety (in the absence of any flasher warning) with implied assurance of safety, together with the fact that only a few split seconds would elapse from the time the tunnel was in view until the time they were on the crossing, these passengers acted as any ordinarily prudent persons would act under the circumstances; and that the conditions were such as should present a question of fact for the jury.

In support of their contention that whether there was contributory negligence, presented a question for the jury, plaintiffs cite *Lauer v. Elgin, J. & E. R. Co.,* 305 Ill. App. 200; *Taylor v. Alton & Eastern R. Co.,* 258 Ill. App. 293; *Henry v. Cleveland, C., C. & St. L. R. Co.,* 236 Ill. 219; *Elgin, J. & E. R. Co. v. Lawlor,* 229 Ill. 621. These cases point out that whether the traveler on the highway could have seen

the approaching train "depends to some extent on the degree of light at the time" and that the circumstances of the particular case might excuse the failure to look and listen. We agree with defendant that the facts in this record show no circumstances to excuse a failure to look and listen like the facts in the cases cited. In the instant case the testimony is undisputed that there was daylight at the time of the occurrence; that the boys were familiar with the crossing; that the Mattox boy lived about four blocks and the Elliott boy about a mile from the crossing; that the highway on which they were traveling was one of the main north and south thoroughfares in Matteson and was the main road to Crete, where the boys were going; that at a point 87 feet north of the point of the collision a traveler on the highway had an unobstructed view for 197 feet down the track to the mouth of the viaduct under the Illinois Central track; that from that point to the place where the eastbound main crosses the highway there were no obstructions of any kind to prevent a traveler on the highway seeing a train between the highway and the crossing; that neither the railroad office building 65 feet north of the eastbound track, nor the elevation supporting the Illinois Central tracks to the west could hide the train; that the train was traveling 25 to 30 miles an hour; that the whistle was sounded from the whistling post, a quarter of a mile west of the crossing, to the crossing; and that the engine bell had been ringing for six miles. The boys were not confused by darkness, nor by an unlighted or obstructed headlight. They were not misled by the absence of the whistle, or by failure to give the whistle and bell signals from the moving train. The facts show no circumstances to excuse a failure to look and listen. As to plaintiffs' statement that there was evidence of a train going west, passing the eastbound train only one half mile before the collision with the automobile, and that this westbound train further ob-

scured the eastbound train from the vision of plaintiffs' decedents, it is obvious that any such westbound train would have been from one to three miles away at the time of the accident and could not have possibly hidden the train involved in the accident. As to plaintiffs' contention that the vision of one approaching the crossing from the north was obstructed by foliage and trees in full bloom and by the depot north of the track, the testimony of plaintiffs' witness, the surveyor, the survey which he prepared and the photographs which he identified, show that there was no shrub or tree or structure of any kind between the depot and the crossing which could in any way interfere with the view down the tracks as far as the viaduct, when the occupant of a car proceeding in a southerly direction on Main street is within 87 feet of the crossing. Failure to stop within a much shorter distance has been held to establish contributory negligence as a matter of law. *Greenwald v. Baltimore & O. R. Co.,* 332 Ill. 627; *Robertson v. New York Cent. R. Co.,* 321 Ill. App. 313; *Holt v. Illinois Cent. R. Co.,* 318 Ill. App. 436; *Wuerz v. Southern Ry. Co.,* 318 Ill. App. 1; *Purdy v. Sprague,* 286 Ill. App. 17.

The undisputed testimony of the engineer and fireman was that the train was traveling 25 to 30 miles an hour. That the locomotive traveled a half mile beyond the crossing after the occurrence was due to the fact that the brakes were not applied until after the collision had occurred and with 26 cars of explosives in the train, the engineer made a gradual service application of the brakes so as to run no risk of doing any more damage by piling up the cars of explosives. As to the contention of plaintiffs that it was mathematically possible that the train had not yet emerged from the viaduct when the automobile reached the point of clear vision, 87 feet north of the crossing, defendants point out that the distance traveled by the train from the viaduct to the point of collision was

two and one quarter times as far as the distance traveled by the automobile, and that in order to make plaintiffs' hypothesis true, the automobile must have been approaching the dangerous railroad crossing at an average speed of more than 55 miles an hour; that if so, plaintiffs' decedents were guilty of contributory negligence as a matter of law, or at least the speed at which the automobile was operated made the driver's negligence the sole proximate cause of the accident. The argument of plaintiffs as to a mathematical possibility does not have any basis in the evidence. We find that there were no circumstances sufficient to excuse failure on the part of plaintiffs' decedents to look and to see the clearly visible train, or to hear and heed its signals, and that they were guilty of contributory negligence as a matter of law. As stated, the burden was upon plaintiffs to prove by a preponderance of the evidence, direct or circumstantial, that their decedents were in the exercise of due care for their own safety at the time of the occurrence. It was not incumbent upon defendant to prove that decedents were guilty of contributory negligence as the proximate cause of their injuries. In an endeavor to sustain the burden of proving due care, the two fathers testified that their sons were boys of ordinarily careful habits in traveling upon the streets and highways. We are of the opinion that it was error to admit this testimony.

In the recent case of *Wilkerson v. Cummings,* 324 Ill. App. 331, we reviewed the law on this subject. In *Petro v. Hines,* 299 Ill. 236, the court said (p. 239):

"But where there is an eyewitness who saw the infliction of the injury, the jury must then determine from the testimony of this witness and from the facts and circumstances surrounding the injury whether deceased was careful or negligent, and in such case evidence of the habits of deceased as to care and pru-

dence is not admissible. (*Chicago, Rock Island and Pacific Railway Co. v. Clark,* 108 Ill. 113.) There was at least one eyewitness to this accident, and the court erred in refusing to exclude this evidence.''

Luebchow was an eyewitness. There was an attempt by plaintiffs to show that his testimony was unavailable because he was in the Army. There was no showing of any attempt to procure his presence at the trial, or to take his deposition. Defendant's witnesses Robertson and Bishop testified as to what they saw as eyewitnesses of the occurrence. · At the close of all the evidence the court overruled defendant's motion to strike the testimony of plaintiffs as to the careful habits of decedents. The court should have allowed this motion. *Petro v. Hines,* 299 Ill. 236. The allegation in each complaint that the decedent was in the exercise of due care and caution for his own safety at the time of the occurrence was a necessary and material allegation, and must be proved. There must be evidence from which the jury may determine this essential element. The jury cannot function without evidence. A jury will not be permitted to base a finding of fact upon conjecture or surmise. With the testimony of plaintiffs as to the careful habits of their sons stricken, and viewing the evidence, taken with its reasonable inferences in its aspect most favorable to plaintiffs, we find as a matter of law that plaintiffs failed to present any competent evidence to establish an essential element of their case, namely, that decedents were in the exercise of due care for their own safety at the time of the occurrence.

 The second point urged by defendant is that the negligence of Donald Luebchow, the driver of the automobile, was the proximate cause of the injuries resulting in the death of decedents. Luebchow drove his automobile onto the crossing despite the fact that the train was clearly visible; that the whistle and bell

on the train were both being sounded; and when for at least 87 feet he had an unobstructed view of the train. In passing on this point we accept plaintiffs' contention that the flasher signals and crossing bells were not operating. Nevertheless, there were other warnings of the approach of the train. In *Briske v. Village of Burnham*, 379 Ill. 193, an action brought by a girl who was a passenger in an automobile which ran into an obstruction, the court said (p. 201):

"Considering the evidence in its aspects most favorable to the plaintiff, the evidence demonstrates that the proximate cause of plaintiff's injuries was the negligence of Jakubcyk, the driver of the car. There is no substantial testimony to the contrary."

In the *Briske* case the Supreme Court sustained the judgment of the Appellate Court in reversing a judgment for plaintiff and entering judgment for defendants. We find that Donald Luebchow, in driving the automobile in which the sons of plaintiffs were riding, was guilty of negligence as a matter of law, and that such negligence was the proximate cause of the injuries which resulted in the death of the boys. *Briske v. Village of Burnham*, 379 Ill. 193; *Trust Co. of Chicago v. Baltimore & O. R. Co.*, 315 Ill. App. 209; *Greenwald v. Baltimore & O. R. Co.*, 332 Ill. 627; *Provenzano v. Illinois Cent. R. Co.*, 357 Ill. 192; *Moudy v. New York, C. & St. L. R. Co.*, 385 Ill. 446.

As the matters ruled upon dispose of the case, we will not lengthen the opinion by discussing the other points presented. For the reasons stated the judgments of the Circuit Court of Cook County are reversed and the cause remanded with directions to enter judgments for the defendant and against the plaintiffs.

*Judgments reversed and cause remanded with directions.*

LUPE, J., concurs.

(See next page.)

KILEY, J., specially concurring: The opinion seems to assume that because the car in which plaintiffs were riding did not stop, slow down or otherwise avoid the collision, under the circumstances, decedents were guilty of contributory negligence. The opinion states that the defendant's contention of a joint enterprise was disregarded by the court.

I agree that the jury must have some evidence of decedents' due care, upon which to decide whether plaintiffs have made out a case; that plaintiffs had the burden of presenting that evidence; and that the court improperly admitted the testimony of the fathers of decedents that the latter had been of careful habits. I do not agree that because defense witnesses, Robertson and Bishop, were "eyewitnesses of the occurrence" the rule which precludes testimony of habits where there are eyewitnesses to the accident, operated here to bar that testimony. It is my view that the secondary evidence of decedents' due care, that of their habits, should not have been admitted because the best evidence of that fact was not shown to be unavailable. The best evidence of that fact is in possession of Luebchow, the driver of the car. The rule barring evidence of habits where there are "eyewitnesses" (*Wilkerson v. Cummings,* 324 Ill. App. 331), undoubtedly applies where the person injured or killed was the driver, or where the person injured or killed was a passenger to whom the driver's negligence was imputable. That is not the case here. The terms "eyewitness to the accident," "eyewitness to the occurrence," "eyewitness who saw the infliction of the injury" are misleading. The test is not whether a witness *saw* an accident, but whether he observed circumstances from which a fact or facts in question necessary to a plaintiff's case may be inferred. The particular fact under question here is the due care of decedent; neither Robertson nor Bishop observed the behavior of decedents immediately before or at the time of the accident. It is not enough to bar the

testimony of decedents' habits that Robertson and Bishop observed the course of the car in which decedents were riding. That course suggests the inference of Luebchow's conduct, not decedents; and Luebchow's conduct is not imputable to decedents. Luebchow was in the automobile with decedents, the lone survivor, and he alone, under the circumstances here, could testify to their conduct. If plaintiffs had shown that he was unavailable, it is my opinion that the testimony of habits would have been admissible to give the jury some evidence upon which to determine decedents' due care. The testimony of Robertson and Bishop presented no such evidence. The testimony of decedents' habits being secondary evidence of their due care, was inadmissible in the absence of a showing that Luebchow was not available to testify. The objection to the testimony should have been sustained. Since that evidence is inadmissible, there is no evidence of decedents' due care.

I have found no case of an Illinois court nor any foreign jurisdiction where the ''eyewitness to the accident'' rule has applied to bar testimony of the habits of a passenger killed in the accident, where there was no better evidence of his due care available and where the driver's conduct was not imputable. Among others, I have read the following cases and have found nothing inconsistent with my reasoning on this point. *Wallis v. Southern Pac. R.*, 15 A. L. R. 117, and note page 125; *Chicago, B. & Q. R. Co. v. Gregory*, 58 Ill. 272; *Chicago, R. I. & P. R. Co. v. Clark*, 108 Ill. 113; Chicago, B. & Q. R. Co. v. Gunderson, 174 Ill. 495; *Chicago & A. R. Co. v. Wilson*, 225 Ill. 50; *Collison v. Illinois Cent. R. Co.*, 239 Ill. 532; *Stollery v. Cicero & P. St. R. Co.*, 243 Ill. 290; *Newell v. Cleveland, C., C. & St. L. R. Co.*, 261 Ill. 505; *Moore v. Bloomington, D. & C. R. Co.*, 295 Ill. 63; *Petro v. Hines*, 299 Ill. 236, 132 N. E. 462; *Wilkerson v. Cummings*, 324 Ill. App. 331.